IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| IN RE THE MATTER OF THE CUSTODY OF | ) ) ) | No. 33652-2-III |
| S.S. and L.S., | ) ) | |
| B.S. | ) ) | UNPUBLISHED OPINION |
| Appellant, | ) ) | |
| and | ) ) | |
| R.S., | ) ) | |
| Respondent. | ) | |

FEARING, C.J. — This appeal concerns custody of two children, Steven and Leander Starr. Appellant Betty Bartholomew is the maternal grandmother of Steven and Leander. Richard Starr is the children's father. Pursuant to Washington's nonparental custody act, Bartholomew sought custody of the two young children. After the case lingered for one and one-half years, the trial court granted Richard Starr's summary judgment motion and dismissed the action. We affirm the trial court's grant of summary

judgment. Although Betty Bartholomew objects on appeal to the use of a summary judgment motion as a tool in disposing of a nonparental custody action, she raised no such objection below. In response to the summary judgment motion, Bartholomew presented no admissible facts that Starr was currently an unfit father.

## FACTS

The parties doggedly dispute the facts and clash over what facts this reviewing court may consider on appeal. Therefore, we delicately outline pertinent facts. The case's procedural outline looms as important as the underlying facts. All names in this opinion are fictitious.

Angie Bartholomew and Richard Starr, who married in 2008, begat two children, Steven and Leander. Angie suffers from bipolar disorder and claims she suffers posttraumatic stress as a result of Starr's domestic violence. Starr received full custody of the two children in the divorce decree entered October 9, 2013. The mother denounced any visitation rights with the children. During the following weeks, the two minors and Richard Starr lived with Starr's aunt, Susan Blythe, in a small apartment in Yakima.

At an unknown date, Richard Starr bit his niece after the niece bit Steven. Law enforcement arrested Starr for the assault on October 28, 2013. Starr indicated his bonding company sought the arrest because of a mistake concerning whether he missed a preliminary hearing. After the arrest, Susan Blythe called police and asked that

2

authorities assume custody of Steven and Leander in part because Steven had assaulted the aunt. Child Protective Services (CPS) assumed custody of the two children, placed them in temporary foster care, and contacted Betty Bartholomew, the children's maternal grandmother, to undertake care of the children. CPS advised Bartholomew, who resides in Bellingham, to file a nonparental custody petition.

In her appeal brief, Betty Bartholomew writes that Richard Starr did not provide reliable and adequate housing for Steven and Leander at the time CPS took the children into protective custody on October 29, 2013. She bases this fact on a CPS report and Richard Starr's declaration. The CPS report read:

> Father [Richard Starr] failed to provide adequate food, shelter and supervision necessary for the children [Leander and Steven Starr's] health, welfare and safety prior to his incarceration.
> The [department]. received info the father was out on bail for an Assault 4 charge. His bail was revoked and he was arrested. At the time, father was residing w[ith] his elderly mother who was unable to care for his children ages 1 & 4 who remained in her care as a result of his arrest.
> The [paternal grandmother] contacted [law enforcement] and informed them she could not care for the children because she had no food, her health was bad and the 4 [year] old child had assaulted her. Father's sister attempted to pick up the children however her paramour was on active Fed[eral] probation. The children's mother [Angie Bartholomew] resides in Ferndale, WA.

Clerk's Papers (CP) at 598. Richard Starr's declaration read, in part, that, upon his arrest, he had arranged for the care of his children with his aunt. The aunt maintained sufficient food and held emergency contact information for the children. Starr was in jail until October 30. He went to CPS on October 31 and sought the return of his children.

3

PROCEDURE

This appeal faced a lengthy and complicated process before the superior court. The parties even dispute the nature of some of the proceedings and what occurred during the proceedings. A reasoned resolution of the appeal requires a long outline of the trial court process.

On October 31, 2013, Betty Bartholomew filed a nonparental custody petition to gain custody of Steven and Leander. The two children were then respectively four and one and one-half years of age. In the petition, Bartholomew alleged that Richard Starr's visitation with his two children should be limited due to "[w]illful abandonment that continues for an extended period of time or substantial refusal to perform parenting functions." CP at 10. Under section 1.13, titled adequate cause, Bartholomew wrote "[t]he children are [sic] not been in the physical custody of either parent since October 29, 2013." CP at 11. The children's mother, Angie Bartholomew, did not contest the nonparental custody action.

With her petition for nonparental custody, Betty Bartholomew filed a declaration. In the declaration Bartholomew averred: "I was told that the children's father was in police custody and his bond and [sic] been revoked." CP at 13. Handwritten after that sentence, Bartholomew added "but got out 10/30." CP at 13. The declaration also indicated CPS told Bartholomew "that if no one came forward to seek custody of the children that they would become wards of the state." CP at 13.

4

On October 31, 2013, the trial court conducted a hearing, without notice to Richard Starr, on Betty Bartholomew's application for a temporary restraining order and order to show cause. The application sought immediate custody of Steven and Leander for Bartholomew. During the October 31 hearing, Bartholomew's attorney informed the court that Richard Starr left jail by posting bond and that Starr claimed to be an enrolled member of the Cherokee Nation. Counsel added that, during Angie Bartholomew and Richard Starr's dissolution action, Starr did not claim Native American heritage. Counsel contended Steven and Leander were not Native American.

During the October 31 hearing, the trial court entered no finding regarding Richard Starr's fitness as a parent or whether adequate cause existed to take custody of Steven and Leander from him. The trial court commented: "so dad's in jail and mom is not capable at this point, right?" Report of Proceedings (RP) (Oct. 31, 2013) at 4-5. Betty Bartholomew's husband replied: "Yeah, dad bonded out yesterday." RP (Oct. 31, 2013) at 5. The trial court then granted an ex parte restraining order that prevented Starr from contact with Betty Bartholomew, Steven and Leander and granting Bartholomew temporary custody of the two children. The trial court also scheduled a hearing for November 14, 2013, and directed Richard Starr to show cause on that date as to whether the temporary restraining order should remain in effect during the pendency of the nonparental custody action.

5

At the November 14, 2013 hearing, Betty Bartholomew asked for a continuance of the show cause hearing because of the unavailability of her counsel. Richard Starr, who appeared at the hearing, did not object to a continuance, but objected to continuance of the restraining order. He repeatedly argued a lack of justification for the restraining order. The trial court granted a continuance of the show cause hearing until December 4, 2013, and renewed the restraining order.

At the December 4, 2013 show cause hearing, Betty Bartholomew requested another continuance. The trial court granted the continuance until December 19, 2013, but lifted the restraining order to the extent of permitting telephone calls and supervised physical visitation between Richard Starr and his two children. On December 19, 2013, Starr requested a continuance of the show cause hearing because an attorney declined to assist him and he had not enjoyed the opportunity to review Betty Bartholomew's and her husband's declarations. The court granted a continuance until January 9, 2014.

Before the January 9 hearing, Betty Bartholomew filed, with the superior court, CPS confidential summary reports concerning Steven, Leander and their parents. A cover sheet, signed by Bartholomew's counsel, accompanied the CPS reports and requested that the reports be filed under seal. Bartholomew also filed a criminal history of Richard Starr accompanied by a cover sheet requesting the history be sealed. Finally, Bartholomew filed the Yakima Police Department report describing Richard Starr's bite of another child and a cover sheet requesting sealing of the report.

6

No. 33652-2-III
*In re Custody of S.S. and L.S.*

The trial court conducted a show cause hearing on January 9, 2014. Steven was then age five and Leander age two. Betty Bartholomew characterizes the January 9 hearing as an adequate cause hearing pursuant to RCW 26.10.032(2). The term "adequate cause" was not spoken during the hearing. Instead Betty Bartholomew's trial court counsel referenced a motion for temporary orders.

The January 9 hearing began with the following colloquy:

> [COURT COMMISSIONER]: All right, go ahead. This is Ms. [Bartholomew's] motion. It looks like it's a Motion for Show Cause, Restraining and Temporary Orders. Is that correct?
> MS. REMY [BETTY BARTHOLOMEW COUNSEL]: Yes, that's correct, Your Honor. . . .
> On the fourth of December we filed a motion for temporary orders. The petitioner is asking that the court grant the visitation detailed in the proposed residential schedule, which is primarily at the discretion of [Betty Bartholomew], which grants visitation for the Respondent [Angie Bartholomew] at the discretion of [Betty Bartholomew], which orders child support as determined pursuant to the Washington State Child Support Statutes, which restrains or enjoins [Richard Starr] from disturbing the peace of [Betty Bartholomew] or any of the children and which restrains him from going onto the grounds or entering the workplace or the school of the other parties, the daycare or the school of [Steven] or [Leander].

RP (Jan. 9, 2014) at 3-4. The trial court then discussed with the parties whether they needed to give notice to the Cherokee Nation, and, if so, whether notice was given. After this discussion, the court commented:

> [COURT COMMISSIONER]: All right. Well, we can go forward with the hearing today. Obviously it's in the best interest of the children to have some resolution. So go ahead.

RP (Jan. 9, 2014) at 6.

7

No. 33652-2-III
*In re Custody of S.S. and L.S.*

During the hearing, Betty Bartholomew acknowledged that Steven and Leander are descendants of the Cherokee Nation. Betty Bartholomew's counsel remarked about Richard Starr:

> Mr. [Starr] has had some criminal history and some CPS involvement, most recently it was a founded finding for abuse. And he was also incarcerated.
> And because he was incarcerated, the home that he left the children in was found to be unfit, and so CPS intervened and put the children in protective custody, and that's where my client became involved to the extent that the children are now with her.
> . . . .
> . . . As far as we're concerned, Mr. [Starr] is an unfit parent. He has been determined unfit by the Department [of Social and Health Services], and the best place for these children, the best interest of the children, are to be with the maternal grandparents, or grandparent.

RP (Jan. 9, 2014) at 6-7.

In response, Richard Starr commented:

> They try to say that the Department has found me unfit. No, they have not. All they did was took my children and place them in a situation because I wasn't there. But I got out and came back.
> . . . .
> . . . I was trying to do the best I can. I'm not unfit. I hit a rough spot. I'm trying to get on my feet. And I'm tired of fighting with the grandparents over my children.

RP (Jan. 9, 2014) at 12-13.

During the January 9, 2014, hearing, the trial court remarked that the issue before the court was whether Richard Starr was currently unfit as a parent. Nevertheless, the court stated:

8

[COURT COMMISSIONER]: Well, we've got a couple things going on. One, we've got Native American children, so we've got to get the tribe involved somehow. There's some difference of opinion about whether or not you're fit, Mr. [Starr]. There is enough information in the court file to lead the court to believe that you have hit a rough patch, that you have an unstable living situation for your children—

MR. SKAGGS: I'll admit that.

. . . .

[COMMISSIONER]: . . . You're currently—at least you were unemployed, you were homeless. You've got some criminal past. I'm not relying heavily on that. But there is a CPS—there is a founded finding in CPS.

There's also a pending criminal charge that you bit a child, and so the court takes that very seriously.

So at this point I'm going to grant the request of Ms. [Bartholomew], but I'm also going to appoint the family court investigator, if she has not been appointed yet, because I think we need to have some research into the background, an investigation about what is in the best interest of the children and whether or not you are truly an unfit parent or whether or not return to your care would be detrimental to the children.

So I'm going to sign an order to that effect as well today.

RP (Jan. 9, 2014) at 14-15. The trial court did not expressly declare Richard Starr to be

an unfit parent.

Following the show cause hearing on January 9, the trial court entered a

handwritten order captioned: "Temporary Orders." CP at 224. The order read:

[I]t is hereby ordered that [Betty Bartholomew] remains the children's custodian and [the] children shall continue to reside with her. The court finds that the children are Indian and notice of this hearing was given to the Cherokee Tribe by Petitioner. The court finds [Richard Starr] to be currently unable to safely care for his children. He shall have 2 telephonic visits with the children per week, 7 p.m., Tuesday and Thursday. In lieu of 1 telephonic visit, father may travel to Bellingham to visit the children in person for 2 hours, 1 time per week, supervised by a paid supervisor paid for by the father or supervisor approved by [Betty

9

Bartholomew], at a date, time, and location to be agreed to in advance by
the parties. All travel expenses shall be borne by the father.

CP at 224-25 (capitalization omitted). No language in the order expressly declared that

the court found adequate cause for the nonparental custody petition. Instead, the trial

court found Richard Starr to be "currently unable to safely care for his children."

Bartholomew contends the order labeled Starr as an "unsuitable" father. The order did

not include the word "unsuitable." On January 9, the court signed a separate order

appointing a family court investigator to investigate and prepare a report regarding

primary placement of the children and alternate residential provisions.

On May 6, 2014, Family Court Investigator Christina Eldridge filed her

investigator's report. The report recommended that custody remain with Betty

Bartholomew on condition that Bartholomew locate a licensed family therapist to

evaluate Steven. The report read, in part:

> While I have no doubt the father loves his children, it is difficult to
> ascertain his ability to effectively parent these children. I am concerned he
> may still have difficulty controlling his anger, and he appears to have
> difficulty maintaining a steady job and stable housing. He stated he would
> like "90 days" to get on his feet and obtain housing and then would like the
> children placed in his care. The fact that this investigator was unable to
> interview the children or the mother made it more difficult to obtain an
> accurate picture of what the children were exposed to, and whether or not
> they are fearful of their father. It would be helpful for a therapist to assess
> [Steven] and provide more detailed information for the court. The father is
> currently employed and is working out of town at this time. He stated he
> would like to see the children when he has enough money to travel to
> Bellingham. The grandparents appear to be appropriate and loving, and
> have enrolled the children in preschool and other activities. The teacher

reported they are thriving. I would recommend the children remain with the grandparents at this time. I would recommend the father obtain a professional visitation supervisor in Whatcom County and begin visiting the children. The father may indeed be a fit parent, but at this point in time there is not enough information to ensure the safety of the children if they were to be placed in his care.

CP at 237. The report did not disclose that Eldridge sent a copy to Richard Starr.

Richard Starr did not seek to visit his children between January 9, 2014 and June 25, 2015. He claims he could not afford travel expenses to Bellingham. The trial court did not entertain any substantive hearing from January 2014 until June 25, 2015. The superior court administrator first scheduled trial for March 17, 2015, but later postponed trial until June 29, 2015.

In April 2015, Richard Starr filed a motion to dismiss that the trial court considered to be a summary judgment motion. The court struck the motion because Starr failed to conform to state and local rules for filing and scheduling a summary judgment motion.

Richard Starr later filed a summary judgment motion, by which he argued that no facts supported a finding that he was an unfit parent. In opposition to the motion, Betty Bartholomew filed, under seal, the family court investigator's report and individual educational plans prepared by Steven's school for Steven. Bartholomew also filed a declaration of herself and many acquaintances who averred that she properly cared for the two children. In a memorandum in response to the summary judgment motion,

11

Bartholomew argued that no facts supported Starr's summary judgment motion. She did not argue that the court should strike the motion because of an earlier adequate cause finding or because a party may not bring a summary judgment motion in a nonparental custody action.

On June 3, 2015, the trial court entertained Betty Bartholomew's motion to postpone the summary judgment hearing. The trial court granted a continuance for three weeks. During the continuance hearing, the trial court questioned Bartholomew's counsel as to whether the trial court had conducted an adequate cause hearing. The following colloquy occurred:

> THE COURT: Okay. I have—I'm curious about a couple things. Mr. [Starr] raises a couple points. He raises the question of whether—why hasn't there ever been an adequate cause hearing. And I looked through and I didn't find that there had ever been an adequate cause finding. Can you address that?
>
> MS. REMY [Betty Bartholomew trial counsel]: Mr. [Starr] was in custody when my client was awarded ex parte emergency custody of the children.
>
> . . . .
>
> MS. REMY: And so I think that was found and sufficiently covered many weeks ago.
>
> THE COURT: No, there's no order—there's no indication that there was ever an adequate cause hearing that I could find. Now, maybe I missed it.
>
> MS. REMY: Okay.
>
> THE COURT: But I looked because Mr. [Starr] raised the issue in his pleading and I did not find there had been any finding.
>
> MS. REMY: Well, if that's an issue, we can address that on proper motion before the Court on the 29th.
>
> THE COURT: Okay. Well, wait a minute.

12

MS. REMY: Today, Your Honor, we're here on a motion for continuance.

THE COURT: I understand, I understand. I'm just curious to know whether or not there was a reason for why there wasn't an adequate cause hearing, and it was an oversight or—okay.

. . . .

THE COURT: The other issue that I saw was that I did not see anything indicating that the tribes had been notified.

. . . .

MS. REMY: They have.

. . . .

THE COURT: Okay, the last question I had asked Ms. Remy was whether or not the tribes had been notified. Again, I didn't see anything in the file to indicate that they had.

MS. REMY: For today's hearing, Your Honor?

THE COURT: No, for this petition, for this case.

MS. REMY: Yes, they have been notified. Again, Your Honor, that's not something that's before the Court today. I am simply asking for a motion to continue a summary judgment.

THE COURT: I know, but what I'm saying, Ms. Remy, is you need to make sure it's in the record.

MS. REMY: Yes.

. . . .

THE COURT: You know there doesn't seem to make a whole lot of sense in pushing this down the road a little bit if the trial is set for the 29th. I guess my only concern is what happens if we get to the 29th and there isn't a judge available, or whatever, and then suddenly the case gets bumped again. So, we'll set it for the 25th at 2:30, and Ms. Remy, you're response must be filed by the 18th.

MS. REMY: Thank you, Your Honor.

THE COURT: And I want—also I'm going to require that your response include a motion for finding adequate cause and it seems to me the adequate cause we're going to have to talk about is adequate cause now, not what the adequate cause may have been in 2013 because we are at now now.

MS. REMY: If adequate cause has not been found previously.

THE COURT: If it's not been found—and I did not find any order indicating adequate cause, but again, maybe I missed it. I'm also going to

13

require that you file proof of notification to the—I think there's more than one tribe involved, isn't there?

MR. [STARR]: No, just my tribe.

THE COURT: Okay. Then I'm going to require that you file proof that the tribe has been notified and assuming they have responded, you need to file the response also. So I will do an order to that effect.

RP (June 3, 2015) at 28-33.

On June 16, 2015, Betty Bartholomew filed a declaration that stated, in part:

As the trial for [Steven and Leander Starr] approaches I wanted to provide the court with an update on how the children are doing.

[Steven] has been placed on an Individual Educational Plan (IEP) for his behavioral issues at school which the school is obviously not qualified to diagnose, but describe to me as being consistent with other children having an emotional behavior disability. He has also been acknowledged as highly intelligent and there is a good possibility that if we can get his behavior under control he will be admitted to a full time gifted program that the school district offers. His reading skill is at the 97 [percent] level and his math is also far above average. Everyone agrees that he will go far if he can get a handle on his behavioral issues. A copy of the IEP has been filed separately under seal. Ann Spitze is the special education teacher and is, overall, the person responsible for [Steven's] IEP.

[Steven] requires the following special accommodations at this time:

1. [Steven] cannot ride the school bus. He must be driven to and from school daily.

2. He has a special diet which involves absolutely no processed sugar or quick acting carbs (such as white flour). His diet is very high in protein. School lunches (like the free and reduced program) do not work.

3. He is receiving compression therapy which involves special "heavy blankets," compression vests and under armor. These are expensive, not covered by insurance and must be repurchased regularly as he grows.

4. During the school year [Steven] is being given occupational therapy by the school, but in the summer he will need regular (possibly daily) therapy that the school is arranging but insurance and the family will have to pay for it. Transportation to and from are also family responsibility.

14

5. [Steven] attends weekly counseling visits one on one with a children's therapist. Insurance and a $30 co-pay per visit are required. I do not believe the service is available with state insurance. He also must be transported to these visits.

6. [Steven's] eye sight requires glasses. He has one very weak eye and one stronger one. He must return to the optometrist regularly to have his vision monitored. We have been told that he may need to wear an eye patch if the vision doesn't self-correct soon.

7. The school is also strongly recommending regular visits to a pediatrician to work on getting a diagnosis and monitor him. Again, more transportation and expense.

[Leander] is struggling with potty training and says things about daddy's being mean. Finding someone to see a child under 3 is proving to be impossible. Her birthday is in March and we intend to pursue therapy once the birthday has occurred. She is also very bright and attends a couple of district sponsored pre-schools a week.

. . . .

The children seem to be very attached to the four individuals in their daily life, me, Vernon, their mother and step-father. It is always a struggle to get the children to speak to their father on the phone and [Steven] in particular has to be almost forced to get on the phone to at least tell his father hello and that he doesn't want to speak with him.

[Richard] has not exercised his ability to have an in-person visit. He has not seen the children in almost a year and a half since they came to live with us. He has not so much as sent them a card or wished them happy birthday or Merry Christmas in that time either.

The phone "visitation" is stressful for the kids and I believe that if they needed to go with [Richard], even for a few hours it would be traumatic for them. I am also afraid that if [Richard] gets the opportunity he will take off with the children.

CP at 394-96.

During the summary judgment motion hearing on June 25, 2015, the trial court again asked whether any judge had previously found adequate cause for nonparental custody. Betty Bartholomew's counsel did not directly answer the question.

THE COURT: Okay. The second issue we discussed last time was whether or not there had ever been a finding of adequate cause. Ms. Remy, you've had the chance now to go back through the file, have you determined whether or not there was ever a finding of adequate cause?

MS. REMY: Your Honor, I don't believe that adequate cause is necessary in a non-parental custody petition.

THE COURT: Alright.

MS. REMY: This was a new petition. This was not done under a previous Parenting Plan or this was not a modification, Your Honor. This was an initial non-parental custody petition that I filed on behalf of my client, the maternal grandmother a year and a half ago.

RP (June 25, 2015) at 37. During argument, Betty Bartholomew never suggested that the court had earlier entered an adequate cause finding.

During summary judgment oral argument, Betty Bartholomew requested that the trial court consider the recently filed individual educational plans as well as the earlier filed CPS summary reports, Starr's criminal history, and the police report regarding the biting incident. The trial court declined to consider the reports and plans because of their hearsay nature. Repeatedly the trial court asked Bartholomew if she had any declarations or affidavits, signed by someone with personal knowledge, to support her claim that Starr was an unfit parent.

THE COURT: Alright. The other issue here is what the moving party is ultimately going to have to prove is that Mr. [Starr] is not a suitable custodian of the children, so what is there that's in the record that meets the requirements of Rule 56 that indicates that he's an unfit parent or not a suitable custodian?

MS. REMY: The numerous police report, CPS report that's founded, findings from the Department alleging negligence, the fact that he wasn't able to find—or provide food, adequate food, shelter or clothing for the

16

children. The fact that he was incarcerated for assaulting of what was originally charged as assault of a four-year old.

THE COURT: Again, Ms. Remy, we're talking about a summary judgment motion and so are there any declarations or affidavits in the file that support—that are based upon personal knowledge that support those statements?

MS. REMY: Yes, Your Honor, in my brief cites to all of those that have been filed, including the law enforcement report, including a CPS report, including the court investigator's report, statements from my client.

RP (June 25, 2015) at 40-41.

I read through every declaration in the file and, Ms. Remy, you have filed literally dozens of declarations that talk about what a good and responsible person your client is but I did not see any declarations from anyone with any personal knowledge that indicated that they had personal knowledge of the father's unsuitability as a custodian for the children. Now, maybe I missed it. Can you point me to a declaration that says that or gives me some information to support that contention?

MS. REMY: We would submit that the CPS report adequately covers what Your Honor is requesting.

THE COURT: Well—

MS. REMY: In finding—finding that his father failed to provide adequate food, shelter and (unintelligible) and was—and this is prior to his incarceration and then he was incarcerated for assaulting a four-year old.

THE COURT: Again, Ms. Remy, do you have an affidavit or a declaration from somebody at CPS who has personal knowledge of the facts upon which you are relying?

MS. REMY: The CPS report covers that. There was a thorough investigation by the Department, Your Honor.

THE COURT: Now the investigation itself would be hearsay and not admissible in a summary judgment hearing. That's why I asked the question and I'm going to ask it one more time, can you point to any declaration or affidavit in the record by a person who has personal knowledge that supports the contention that Mr. [Starr] is an unsuitable parent?

RP (June 25, 2015) at 41-42.

17

Betty Bartholomew's counsel also asked the trial court to consider the family court investigator's report as evidence in opposition to the summary judgment motion. The trial court impliedly agreed and reviewed the report before ruling.

> MS. REMY: In addition to the CPS report which was lengthy—and the information supported—excuse me, in my client's declaration. The court investigator thoroughly—also thoroughly investigated this case, Your Honor, and provided her recommendation. She spoke with the placement, spoke with the parties involved.
> THE COURT: Well, again her report would be hearsay and not admissible in a summary judgment proceeding.
> MS. REMY: It's my understanding that the court investigator's report is admissible as evidence under 26—or RCW 26 (as heard), but Your Honor, I don't have the exact cite in front of me.
> THE COURT: Okay, I'm looking for that report. . . .
> . . . .
> THE COURT: Okay. Let me review it one more time. Okay, I have reviewed that report. Anything else, Ms. Remy?

RP (June 25, 2015) 42-43.

On June 25, 2015, the trial court granted Richard Starr's summary judgment motion. The court observed that the court had never found adequate cause to remove Steven and Leander from their father and that, in response to Starr's motion, Betty Bartholomew had raised no genuine issue of material fact to support her claim. The trial court dismissed Bartholomew's nonparental custody petition and ordered that the children be returned to Starr. After the trial court's ruling, Betty Bartholomew contended for the first time that the trial court entered an adequate cause finding on January 9, 2014.

As part of his summary judgment motion, Richard Starr requested an award of

18

$2,725 in attorney fees. Nevertheless, no attorney ever entered a notice of appearance on behalf of Starr or signed any of Starr's pleadings. During oral argument at the summary judgment hearing, Starr asserted that an attorney assisted him in preparing his motion. The trial court did not address Starr's request for attorney fees.

After appealing the trial court order on summary judgment, Betty Bartholomew filed a CR 60 motion to vacate the grant of summary judgment. Bartholomew argued that the January 9, 2014 hearing was an adequate cause hearing in substance and that an adequate cause hearing is a substitute for a summary judgment hearing. The trial court denied the motion to vacate.

## LAW AND ANALYSIS

On appeal, Betty Bartholomew forwards numerous arguments in support of her assignment of error based on the trial court's dismissing her nonparental custody petition on summary judgment. She argues that the trial court should not have entertained the summary judgment motion for two related, but distinct, reasons: she already established adequate cause for gaining custody of Steven and Leander and a trial court should never entertain a summary judgment motion in a nonparental custody action. Next, Bartholomew maintains the trial court erred, when reviewing the summary judgment motion, by failing to consider the CPS reports, the individualized education plans for Steven, Richard Starr's criminal history, and the police report surrounding the child bite. Finally, she contends issues of fact precluded summary judgment.

19

In response to the appeal, Richard Starr contends the superior court never entertained an adequate cause hearing, the trial court correctly ruled that no evidence supported a conclusion that he was an unfit father in June 2015, Betty Bartholomew lacked standing to seek nonparental custody, Betty Bartholomew failed to comply with the Indian Child Welfare Act, 25 U.S.C. ch. 21, and the trial court erred in failing to award him fees and costs. Starr filed no cross appeal.

*Issue 1: Should the trial court have refused to entertain a summary judgment motion because the court had already entered a finding of adequate cause?*

*Answer 1: We refuse to address this issue because, in response to the summary judgment motion, Betty Bartholomew never argued this point.*

Under RCW 26.10.030, a third party may file a nonparental custody petition "if the child is not in the physical custody of one of its parents or if the petitioner alleges that neither parent is a suitable custodian." Upon filing a petition, the third party must submit affidavits and obtain a court order of adequate cause before proceeding further with the action. RCW 26.10.032. In other words, a court adjudicating a nonparental custody petition must make a threshold determination that adequate cause justifies a hearing on the petition. RCW 26.10.032(2); *In re Custody of E.A.T.W.*, 168 Wn.2d 335, 342, 227 P.3d 1284 (2010).

In response to Richard Starr's summary judgment motion, Betty Bartholomew never contended the trial court should decline to hear the motion because of a previous

adequate cause determination. An appeals court will not review an issue, theory, argument, or claim of error not presented at the trial court level. RAP 2.5(a); *Lindblad v. Boeing Co.*, 108 Wn. App. 198, 207, 31 P.3d 1 (2001). A party must inform the court of the rules of law it wishes the court to apply and afford the trial court an opportunity to correct any error. *Smith v. Shannon*, 100 Wn.2d 26, 37, 666 P.2d 351 (1983). The purpose of this general rule is to give the trial court an opportunity to correct errors and avoid unnecessary rehearings. *Postema v. Postema Enterprises, Inc.*, 118 Wn. App. 185, 193, 72 P.3d 1122 (2003).

In response to the summary judgment motion, Betty Bartholomew never even claimed that the trial court previously entered an adequate cause order. During an earlier hearing, the trial court warned counsel that she needed to establish the existence of an adequate cause finding. During the summary judgment hearing, the trial court expressly asked Bartholomew's counsel if the court previously entered such an order. Instead of answering in the affirmative, counsel stated no finding was needed. If Bartholomew now claims error because the trial court entertained the summary judgment motion, she should have identified for the court the order that found adequate cause. By failing to do so, she helped create any error such that the invited error doctrine also controls on appeal.

The invited error doctrine precludes a party from seeking appellate review of an error she helped create. *State v. Studd*, 137 Wn.2d 533, 546-47, 973 P.2d 1049 (1999); *State v. Henderson*, 114 Wn.2d 867, 870-71, 792 P.2d 514 (1990). The doctrine of

invited error prohibits a party from setting up an error at trial and then complaining of it on appeal. *State v. Wakefield*, 130 Wn.2d 464, 475, 925 P.2d 183 (1996); *State v. Pam*, 101 Wn.2d 507, 511, 680 P.2d 762 (1984), *overruled on other grounds by State v. Olson*, 126 Wn.2d 315, 893 P.2d 629 (1995). To determine whether the invited error doctrine is applicable to a case, we may consider whether the petitioner affirmatively assented to the error, materially contributed to it, or benefited from it. *State v. Momah*, 167 Wn.2d 140, 154, 217 P.3d 321 (2009); *In re Pers. Restraint of Copland*, 176 Wn. App. 432, 442, 309 P.3d 626 (2013).

Betty Bartholomew's counsel for the first time, after the trial court's ruling on June 25, 2015, orally contended that the January 9, 2014 hearing constituted an adequate cause hearing. Counsel should have earlier and timely answered the trial court's questioning as to an adequate cause hearing instead of waiting until after the ruling, particularly when the trial court warned counsel in advance of the summary judgment hearing to find any record establishing the existence of such a hearing.

After entry of the summary judgment order and dismissal of the petition for nonparental custody, Betty Bartholomew for the first time argued in writing that the January 9, 2014 hearing constituted an adequate cause hearing and presumably the January 9 order included a finding of adequate cause for the petition. She argued in a motion to vacate the order that the trial court's failure to recognize the January 9 hearing as an adequate cause hearing constitutes an "irregularity" requiring vacation of the order.

The trial court denied the motion to vacate. Bartholomew does not assign error to the denial of the motion to vacate.

*Issue 2: Should the trial court have refused to entertain a summary judgment motion is not a permissible tool in a nonparental custody action?*

*Answer 2: We refuse to address this issue because, in response to the summary judgment motion, Betty Bartholomew never argued this point.*

In response to Richard Starr's summary judgment motion, Betty Bartholomew never contended that the motion could not be brought in a nonparental custody action. For the same reason that we decline to entertain Bartholomew's argument that an adequate cause determination precluded review of the summary judgment motion, we decline to entertain the contention that a summary judgment motion is impermissible in a nonparental custody petition.

*Issue 3: Whether the trial court should have considered the CPS reports, individualized education plans for Steven, and police reports as evidence in opposition to the summary judgment motion?*

*Answer 3: No.*

Betty Bartholomew contends that the trial court erred by refusing to examine CPS reports, police reports, Steven's individual education plan (IEP), and Richard Starr's criminal history report. She argues that family law proceedings "are in a universe unto themselves" and that the trial court, pursuant to Title 26 RCW, should have considered

23

the confidential reports. Appellant's Br. at 20. We reserve for later discussion her argument that the trial court should have considered the family court investigator's report.

Richard Starr argues that Betty Bartholomew's assignment of error misleads because the trial court read the declarations Bartholomew filed. Starr is correct that the trial court read the declarations, but this argument is misplaced. Bartholomew does not complain that the trial court failed to review declarations. The reports and education plans were not attached to any declaration. Bartholomew claims the court committed error by not reviewing the reports and plans regardless of whether she attached them to a declaration.

CR 56, a portion of the summary judgment court rule, controls. The rule reads, in part:

> **(e) Form of Affidavits; Further Testimony; Defense Required.**
> Supporting and opposing affidavits shall be made on personal knowledge,
> shall set forth such facts as would be admissible in evidence, and shall
> show affirmatively that the affiant is competent to testify to the matters
> stated therein. Sworn or certified copies of all papers or parts thereof
> referred to in an affidavit shall be attached thereto or served therewith.

Underlying CR 56(e) is the requirement that documents the parties submit must be authenticated to be admissible. *International Ultimate, Inc. v. St. Paul Fire & Marine Insurance Co.*, 122 Wn. App. 736, 745-46, 87 P.3d 774 (2004).

ER 901 or ER 902 address authenticity. ER 901(a) reads:

No. 33652-2-III
*In re Custody of S.S. and L.S.*

> The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

ER 901 provides a nonexhaustive list of methods of authenticating evidence. The method normally used in summary judgment appears to be an affidavit signed by someone with personal knowledge. That was not done here, and the record is silent on any other means of authenticating any of the documents under ER 901. For a court to consider documents in opposition to a summary judgment motion, the proponent of the document should submit the documents with an affidavit establishing the foundation and attaching the documents to the affidavit. CR 56(e); *Milligan v. Thompson*, 110 Wn. App. 628, 635, 42 P.3d 418 (2002). Betty Bartholomew failed to do so.

ER 902 provides an exhaustive list of documents that are self-authenticating. There are three categories in ER 902, on which Betty Bartholomew could have relied, to authenticate the documents in question: certified copies of public records, acknowledged documents, and presumptions created by law. Those sections declare:

> **(d) Certified Copies of Public Records.** A copy of an official record or report or entry therein, or of a document authorized by law to be recorded or filed and actually recorded or filed in a public office, including data compilations in any form, certified as correct by the custodian or other person authorized to make the certification, by certificate complying with section (a), (b), or (c) of this rule or complying with any applicable law, treaty or convention of the United States, or the applicable law of a state or territory of the United States.
>
> . . . .
>
> **(h) Acknowledged Documents.** Documents accompanied by a certificate of acknowledgment executed in the manner provided by law by a

25

notary public or other officer authorized by law to take acknowledgments.
. . . .
**(j) Presumptions Created by Law.** Any signature, document, or
other matter declared by any law of the United States or of this state to be
presumptively or prima facie genuine or authentic.

ER 902. Assuming subsections (d) and (h) apply to police reports, CPS reports, and

educational plans, none of the reports were certified. Betty Bartholomew does not argue

that subsection (j) applies for these reports.

Betty Bartholomew faults the trial court for not following RCW 26.10.135, which

directs the court to review background information before granting a custody order in a

nonparental custody case. The statute reads:

> **Custody orders—Background information to be consulted.**
> (1) Before granting any order regarding the custody of a child under
> this chapter, the court shall consult the judicial information system, if
> available, to determine the existence of any information and proceedings
> that are relevant to the placement of the child.
> (2) Before entering a final order, the court shall:
> (a) Direct the department of social and health services to release
> information as provided under RCW 13.50.100; and
> (b) Require the petitioner to provide the results of an examination of
> state and national criminal identification data provided by the Washington
> state patrol criminal identification system as described in chapter 43.43
> RCW for the petitioner and adult members of the petitioner's household.

RCW 26.10.135. We refuse to address this contention since Bartholomew did not raise

the statute before the trial court. Also, the statute requires the court's perusal of

information before entering an order of custody, not before dismissing the case for lack

of evidence. Some of the information listed in the statute concerns only the petitioner,

not the respondent parent.

Betty Bartholomew posits that CR 56(c) authorizes the trial court to consider any pleadings in the clerk's file as long as a party mentions the pleading. She underscores CR 56(c), which reads, in relevant part: "The judgment sought shall be rendered forthwith if the *pleadings*, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Emphasis added.) She focuses on the word "pleadings."

Betty Bartholomew's argument fails to recognize a critical passage within CR 56. CR 56(e) reads, in pertinent part: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." In making a responsive showing, the nonmoving party cannot rely on the allegations made in its pleadings, but, by affidavits or as otherwise provided in CR 56, must set forth specific facts showing there is a genuine issue for trial. *Young v. Key Pharmaceuticals, Inc.*, 112 Wn.2d 216, 225-26, 770 P.2d 182 (1989).

*Issue 4: Whether the trial court should have considered the family court investigator's report as evidence in opposition to the summary judgment motion?*

*Answer 4: We do not address this issue since the record shows the trial court reviewed the report.*

27

Betty Bartholomew next contends that the trial court should have, under RCW 26.10.130, considered the investigator's report without any authentication. The statute controls the appointment of an investigator in a child custody case and use of the investigator's report. The statute reads, in relevant part:

> (1) In contested custody proceedings, and in other custody proceedings if a parent or the child's custodian so requests, the court may order an investigation and report concerning custodian arrangements for the child, or may appoint a guardian ad litem pursuant to RCW 26.12.175, or both. The investigation and report may be made by the guardian ad litem, the staff of the juvenile court, or other professional social service organization experienced in counseling children and families.
> (2) . . . If the requirements of subsection (3) of this section are fulfilled, the investigator's report may be received in evidence at the hearing.
> (3) The investigator shall mail the investigator's report to counsel and to any party not represented by counsel at least ten days prior to the hearing unless a shorter time is ordered by the court for good cause shown. The investigator shall make available to counsel and to any party not represented by counsel the investigator's file of underlying data and reports, complete texts of diagnostic reports made to the investigator pursuant to the provisions of subsection (2) of this section, and the names and addresses of all persons whom the investigator has consulted. Any party to the proceeding may call the investigator and any person whom the investigator has consulted for cross-examination. A party may not waive the right of cross-examination prior to the hearing.

The statute does not identify the form of "hearing," in which the report may be received into evidence under subsection 2. We presume such a hearing includes a summary judgment hearing, since the hearing can be as dispositive as a trial.

We reject Betty Bartholomew's contention on appeal for two reasons. First, she has not confirmed that the family court investigator complied with subsection 3 of the

statute. For example, we have no confirmation that the investigator mailed a copy of the report to Richard Starr. Second, the record shows that the trial court considered the investigator's report. He reviewed it before ruling.

*Issue 5: Whether the trial court erred when granting summary judgment to Richard Starr?*

*Answer 5: No.*

The trial court dismissed, on summary judgment, Betty Bartholomew's petition for nonparental custody of Steven and Leander Starr. Therefore, we must explore what proof one needs in order to gain custody of a child under the nonparental custody act.

Under RCW 26.10.030, a third party may file a nonparental custody petition "if the child is not in the physical custody of one of its parents or if the petitioner alleges that neither parent is a suitable custodian." One of the key provisions of the nonparental custody act is RCW 26.10.100. This section reads:

> The court shall determine custody in accordance with the best interests of the child.

This standard interferes in a parent's constitutional right to the care, custody and companionship of a child. Therefore, to prevail, the nonparent must show more than the best interests of the child are served by taking custody from the parent. The petitioning party must show that the natural parent is unfit or placement with the parent causes actual detriment to the child's growth and development. *In re Custody of Shields*, 157 Wn.2d

126, 144, 136 P.3d 117 (2006). Lack of physical custody alone is insufficient to establish adequate cause. *In re Custody of E.A.T.W.*, 168 Wn.2d at 345.

Because of the severe consequences of an erroneous deprivation of a parent's custody rights, a court must apply a rigorous standard of proof in resolving third party custody petitions. *In re Custody of C.C.M.*, 149 Wn. App. 184, 204-05, 202 P.3d 971 (2009). Thus, the petitioning party must prove his or her case by clear and convincing evidence. *Custody of C.C.M.*, 149 Wn. App. at 205. This burden of proof is so substantial that, when properly applied, it will be met in only extraordinary circumstances. *Custody of C.C.M.*, 149 Wn. App. at 204.

This appeal comes to us on a summary judgment dismissal. Appellate courts review summary judgment de novo. *Heath v. Uraga*, 106 Wn. App. 506, 512, 24 P.3d 413 (2001). Summary judgment is appropriate when there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. CR 56(c). Based on the percipient testimony before the trial court, there was no issue of fact. We agree with the trial court that none of Bartholomew's admissible evidence showed Starr to be unfit as a father.

To defeat Richard Starr's summary judgment motion, Betty Bartholomew needed to present evidence that Starr was an unfit parent or his custody would result in actual detriment to one of the children's growth and development. Bartholomew, in her declaration, mentioned that Starr had been in jail and left the children in an unsafe

30

environment. CPS then took custody of the children. These events occurred one and one-half years before the summary judgment motion hearing. Bartholomew presented no evidence to support a finding that Starr was an unfit parent in June 2015.

In a marital dissolution custody dispute, this court noted that the test for fitness of custody is the present condition of the mother and not any future or past conduct. *In re Marriage of Nordby*, 41 Wn. App. 531, 534, 705 P.2d 277 (1985). This same principle should apply in a third party custody case.

Betty Bartholomew submitted a declaration that supports a finding that Steven holds special needs, in part because of Asperger's syndrome. The declaration also mentions that Richard Starr has failed to exercise visitation rights with the children and that phone calls with their father induce stress in the children. Nevertheless, Betty Bartholomew submitted no percipient testimony from herself or others that Steven would face actual detriment to his growth and development if Richard Starr regained custody.

*Custody of C.C.M.*, 149 Wn. App. 184 (2009) establishes that lack of visitation between a parent and a child is not grounds for nonparental custody. In *C.C.M.*, this court affirmed the trial court's denial of the grandparents' petition for custody and award of placement to the father. The child lived with the grandparents since her birth and until the filing of the petition. The record showed no visits by the father until after the filing of the petition.

Betty Bartholomew faults Richard Starr for failing to file affidavits that

31

affirmatively showed him to be a fit parent. We question this argument since Starr filed an affidavit from himself. Nevertheless, because Betty Bartholomew had the burden of proving Starr to be unfit, Starr had no obligation to file affidavits to prove his claim. Under CR 56(b), a party against whom a claim is asserted "may move with or without supporting affidavits for a summary judgment." A party moving for summary judgment can meet its burden by pointing out to the trial court that the nonmoving party lacks sufficient evidence to support its case. *Young v. Key Pharmaceuticals, Inc.*, 112 Wn.2d at 225 n.1 (1989); *Seybold v. Neu*, 105 Wn. App. 666, 677, 19 P.3d 1068 (2001). In such a situation, the moving party is not required to support its summary judgment motion with affidavits. *Young v. Key Pharmaceuticals, Inc.*, 112 Wn.2d at 226. If a defendant chooses this method of seeking summary judgment, the requirement of setting forth specific facts does not apply. *Seybold v. Neu*, 105 Wn. App. at 677. The reason for this result is that a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Seybold v. Neu*, 105 Wn. App. at 677.

Because we affirm the summary judgment order on the grounds of lack of evidence of an unfit father, we need not address whether Betty Bartholomew intentionally withheld the children from Richard Starr in order to gain standing. We also do not decide whether the Indian Child Welfare Act applies.

32

*Issue 6: Whether the trial court erred when denying Richard Starr an award of reasonable attorney fees and costs at the trial court level?*

*Answer 6: We do not address this issue since Richard Starr did not cross appeal the denial of fees.*

Richard Starr seeks a reversal of the trial court's denial of his request for reasonable attorney fees and costs. He argues that fees should have been granted because Betty Bartholomew infringed his constitutional right to his children. With his contention, Starr attempts to cross appeal the denial of attorney fees below. Nevertheless, he filed no cross appeal. Therefore, we refuse to address his contention.

*Issue 7: Whether Betty Bartholomew should be awarded reasonable attorney fees and costs on appeal?*

*Answer 7: No.*

Betty Bartholomew requests an award of attorney fees in a footnote in her brief that reads: "Ms. [Bartholomew] should be awarded fees and found in contempt on appeal for filing an affidavit in bad faith. CR 56(g)." Appellant's Br. at 29 n.8. She repeats this request in her reply brief. Taken literally, Bartholomew volunteers to be found in contempt, but we assume she requests an award of fees against Richard Starr.

RAP 10.3 requires argument to be supported by citations to legal authority and references to the record. RAP 10.3(a)(6). Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration. *Holland v. City of*

33

*Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998). Since Betty Bartholomew presents no reasoned argument as to why she should be awarded fees, we deny the request. We also note that she does not prevail on appeal.

*Issue 8: Whether Richard Starr should be awarded reasonable attorney fees and costs on appeal?*

*Answer 8: No.*

Richard Starr also requests attorney fees on appeal. He first argues that this appeal is frivolous and so he is entitled to attorney fees pursuant to RCW 4.84.185. RCW 4.84.185 allows the court to award attorney fees if it determines the action was frivolous. Such an award is available only when the action as a whole, can be deemed frivolous. A lawsuit is frivolous if, when considering the action in its entirety, it cannot be supported by any rational argument based in fact or law. *Dave Johnson Ins., Inc. v. Wright*, 167 Wn. App. 758, 785, 275 P.3d 339 (2012). We find that Bartholomew has forwarded some debatable arguments, particularly since the law surrounding nonparental custody claims is unsettled.

Richard Starr also seeks attorney fees under RAP 18.1 and RCW 26.10.080. RAP 18.1(a) allows this court to award reasonable attorney fees and costs if applicable law grants the party the right to recover them. RAP 18.1(c), however, demands that, if the underlying statute requires consideration of financial resources, the requesting party must file an affidavit of financial need. RCW 26.10.080 requires a consideration of financial

34

resources and provides that "[u]pon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorney's fees in addition to statutory costs." If the requesting party fails to file an affidavit of need as required by RAP 18.1(c), this court has refused to award attorney fees. *In re the Marriage of Holmes*, 128 Wn. App. 727, 742, 117 P.3d 370 (2005). Richard Starr has not filed an affidavit of financial need. Therefore, we deny his request for attorney fees.

## CONCLUSIONS

We affirm the trial court's dismissal, on summary judgment, of Betty Bartholomew's nonparental custody action. We deny both parties an award of reasonable attorney fees and costs at either the trial court level or on appeal.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, C.J.

WE CONCUR:

_____        _____
Korsmo, J.                                          Pennell, J.

35